Joshua P. Davis, Bar No. 193254
jdavis@bm.net
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
T. 415.215.0962
F. 215.875.4604

John G. Albanese*
jalbanese@bm.net
Ariana B. Kiener*
akiener@bm.net
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999
F. 612.584.4470

Carl F. Engstrom*
cengstrom@engstromlee.com
Mark E. Thomson*
mthomson@engstromlee.com
ENGSTROM LEE LLC
729 N Washington Ave., Suite 600
Minneapolis, MN 55401
T. 612.305.8349

*admitted pro hac vice

Counsel for All Plaintiffs

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| Andrea Capito Blanchard, Phillip Cohen, individually and as representatives of the Class,<br><br>              Plaintiffs,<br><br>     vs.<br><br>Americo Financial Life and Annuity Insurance Company,<br><br>              Defendant. | Case No. 5:23-cv-04087-PCP<br><br>**FIRST AMENDED COMPLAINT FOR RESTITUTION AND INJUNCTIVE RELIEF**<br><br>**CLASS ACTION**<br><br>(1) Violations of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*<br><br>**DEMAND FOR JURY TRIAL** |

COME NOW, Plaintiff Andrea Capito Blanchard ("Plaintiff Blanchard") and Plaintiff Phillip Cohen ("Plaintiff Cohen") (collectively "Plaintiffs"), on behalf of themselves and the Class set forth below, and state as follows:

## INTRODUCTION

1. This case is brought as a class action on behalf of California public school educators against Defendant Americo Financial Life and Annuity Insurance Company ("Defendant") for charging teachers millions of dollars in undisclosed and unauthorized fees on their supplemental retirement savings plans, in violation of Cal. Educ. Code § 25100, *et seq.* (the "Code"), as well as the California Unfair Competition Law, Cal. Bus. & Prof. Code, § 17200, *et seq.* (the "UCL").

2. California is home to more than 300,000 public school teachers. For most of them, the funds provided by the state's pension system for educators will not be enough to finance their golden years, so the vast majority of teachers supplement their pensions with personal retirement savings plans.

3. Teachers' personal retirement savings are often invested in retirement plans offered by their school districts pursuant to a provision of the federal tax code, 26 U.S.C. § 403(b), that allows public schools and 501(c)(3) non-profits to offer employees tax advantaged employer-sponsored retirement plans. These plans are commonly referred to as 403(b) plans and offer different investment options, including annuity contracts provided through insurance companies and custodial accounts invested in mutual funds.

4. The 403(b) market for California teachers has long been rife with abuse, including aggressive sales tactics, hidden (and astronomical) fees, and poor returns on investments.

5. Lobbied by insurance companies, the California Legislature adopted Section 770.3 of California's Insurance Code, which provides that districts must remit payroll deductions to whichever provider an employee chooses. *See* Cal. Ins. Code § 770.3. This opened the door for all 403(b) vendors into California schools, where they quickly set up in teachers' lounges with glossy brochures and free baked goods.

6. For many years, these vendors had no obligation to disclose to educators the full set

of fees associated with their investment products. As a result of insurance companies' aggressive marketing tactics and incomplete disclosures, teachers were often funneled into indexed annuities that came with high fees and low returns while providing huge profits for the insurance companies peddling them.

7.      To correct this injustice, the California Legislature passed the Code, which requires 403(b) vendors to provide certain information about their products on a publicly accessible website, 403bcompare.com ("the Website"), so that teachers can make informed decisions about what investments to hold in their supplemental retirement plans. Indeed, the very URL of this website underscores its purpose: to allow educators to *compare* their 403(b) options.

8.      To enable teachers to do so, perhaps the biggest change ushered in by the Code was a requirement that 403(b) vendors must fully disclose "all expenses paid directly or indirectly by plan participants." As defined by the statute, the expenses that must be disclosed include all fees, "including, but not limited to…management fees, and annual fees[.]" *See* Cal. Educ. Code § 25101(a)(3). 403(b) vendors are prohibited from charging fees that are not so disclosed. *See* Cal. Educ. Code § 25107.

9.      The Code's emphasis on disclosures is intentional. When insurance companies, mutual fund companies, and broker-dealers fully disclose their fees, teachers can meaningfully compare products both when they initially select 403(b) plans, and as they reevaluate their investment strategies (*e.g.*, when they consider replacing an old 403(b) plan with a new one) on an ongoing basis. This transparency allows California's educators to make informed decisions when planning for retirement.

10.    Disclosure of fees also keeps the 403(b) market competitive. When fees are fully disclosed, vendors are incentivized to keep their fees low in order to attract teachers to their plans.

11.    Full disclosures also ensure that mutual fund companies, broker-dealers, and insurance companies compete on a level playing field; that is, when all companies disclose their fees, no one company is allowed to unfairly benefit and to lure unsuspecting investors by hiding some or all of its fees.

FIRST AMENDED CLASS ACTION COMPLAINT
Case No. 5:23-cv-04068-PCP

12.     Defendant—a nationwide insurance and annuity company and one of California's largest and most profitable 403(b) vendors—systematically violates the Code. Specifically, Defendant charges numerous hefty expenses on indexed annuities purchased by California's public school teachers, but fails to fully disclose those expenses on 403bcompare.com. For example, Defendant fails to disclose that its fees are among the highest in the state—averaging over 3.3% per year since 2019—and that its sales agents are among the highest paid—averaging commissions of 9.5 percent of assets invested. Fees this high are disastrous for teachers trying to save for retirement, cutting their nest egg nearly in half by the time of their retirement.

13.     The below illustration[1] demonstrates the impact that differences in fees have on annuity returns over time:



**BY THE NUMBERS**
Total value of investment after 35 years, assuming $250 contributed monthly with an 6% average annual return:

14.     Defendant's conduct, which violates the Code, has enabled Defendant to thrive in the California 403(b) market for public school teachers—at the expense of educators and those 403(b) vendors that do comply with the Code's disclosure requirements. By hiding its fees, Defendant has lured unsuspecting teachers into its poorly performing products (and kept them there), and away from better products sold by vendors that disclose their fees, as required.

15.     Plaintiffs are two such teachers, paying thousands of dollars to Defendant in unlawful, undisclosed fees on their poorly performing indexed annuities.

---

[1] Illustration taken from https://403bwise.org/education/bad-403b (last accessed Feb. 24, 2023).

16.     On behalf of themselves and a Class of similarly situated individuals, Plaintiffs bring claims pursuant to the UCL seeking redress for Defendant's unlawful and unfair conduct. Under California law, Plaintiffs and the Class are entitled to equitable restitution. Plaintiffs and the Class also seek injunctive relief requiring Defendant to provide the required disclosures moving forward, which will safeguard against future illegal practices by Defendant.

**PARTIES**

17.     Individual and representative Plaintiff Andrea Capito Blanchard is a resident of Marina, California. Before retiring recently, Blanchard taught special education for 24 years before retiring, last working in the North Monterey Unified School District.

18.     From 2002 to the present, Plaintiff Blanchard has been invested in a 403(b) product offered by Defendant with the product name Equity Indexed Annuity. She holds two separate policies, each with the product name Equity Indexed Annuity, which were issued on November 8, 2002, and April 14, 2008. Over the past 15 years, Blanchard has incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

19.     Individual and representative Plaintiff Phillip Cohen is a resident of Los Angeles, California. Cohen worked in California public schools as a Resource Specialist/Special Day Class teacher for 40 years, the last 32 of which were spent in the Los Angeles County Office of Education.

20.     From 1999 to 2020, Plaintiff Cohen was invested in a 403(b) product offered by Defendant with the product name Equity Indexed Annuity. His policy was issued on May 21, 1999. For over 20 years, Plaintiff Cohen incurred fees within this product that were illegal pursuant to Cal. Educ. Code §§ 25101, 25107 because they were not disclosed as required by the Code.

21.     Defendant is incorporated in Texas and has its principal place of business at 300 West 11th Street, Kansas City, Missouri.

22.     Defendant is a subsidiary of holding company Americo Life, Inc., whose principal office is also located at 300 West 11th Street, Kansas City, Missouri.

23.     "Americo is the brand name for insurance products issued by the subsidiary insurance

-4-

companies controlled by Americo Life, Inc."[2]

24.    "Americo Life, Inc…is currently one of the largest, independent, privately held insurance companies in the United States."[3]

25.    According to the Americo-brand website, Defendant "[u]nderwrite[s], issue[s], and manage[s] in-force life insurance, Medicare Supplement insurance, and annuity products."[4]

26.    Annuity products are one of Defendant's primary sources of income.

27.    In 2021, Defendant reported total income of more than $2.2 billion.

28.    As of 2020, Defendant was licensed in 49 states and the District of Columbia, with a concentration of new sales in California, Florida, Texas, Michigan, and North Carolina.

29.    Defendant never registered the Equity Indexed Annuity product on the 403bcompare website.

30.    Defendant did not register a single product on the 403bcompare.com website until December 2007.

31.    Between December 2004 and 2008, Defendants sold the Equity Indexed Annuity product to numerous new enrollees in California public school districts through the 403(b) program who had not previously purchased any 403(b) products from Defendant. Defendant was therefore required to register the Equity Indexed Annuity product on 403bcompare.com under the Code.

## JURISDICTION AND VENUE

32.    This case was initially filed in the Superior Court for Santa Clara County, California. Defendant removed the case to this Court under 28 U.S.C. § 1441(a) asserting that jurisdiction was appropriate under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) and 28 U.S.C. § 1453(b).

33.    Defendant conducts business, including advertising and selling life insurance and annuity products, in the state of California.

34.    Venue is appropriate in this District Under 28 U.S.C. § 1441(a).

35.    **Divisional Assignment.** Per Civil L.R. 3.2(e), because this case was removed from

---

[2] *See* at https://www.americo.com/who-we-are/ (last accessed March 31, 2023).
[3] *Id.*
[4] *See* https://www.americo.com/ac_docs/CompanyNamesLogos.pdf (last accessed March 31, 2023).

Santa Clara County, it is appropriate to assign the case to the San Jose division.

## **BACKGROUND**

**A. Overview of Retirement Landscape for California Public School Teachers:**
   **CalSTRS and 403(b) Annuities.**

36. The California State Teachers' Retirement System ("CalSTRS") was established in 1913 to provide retirement benefits to California's public school educators via a pension.

37. Today, CalSTRS administers retirement programs for about 880,000 members and is the largest educator-only pension fund in the world, and the second largest pension fund in the U.S.

38. Importantly, California public school teachers do not contribute to or receive Social Security benefits. Instead, they only contribute to and receive benefits from CalSTRS. And, increasingly, the pension provided by CalSTRS is not enough to finance a teacher's retirement.

39. According to CalSTRS, the average teacher who retired in 2020–21 had 25 years of service and a monthly benefit of $4,813, or $57,756 a year.[5]

40. As the California Teachers Association warns, this "pension will not cover 100% of the income [teachers] need to live on in retirement . . . [F]or most people, their pension will cover only about 50% to 65% of the income they will need in retirement."[6]

41. Between not receiving any Social Security benefits and the fact that CalSTRS does not provide sufficient retirement income, many California public school teachers decide to open supplemental personal retirement accounts, in the form of 403(b) plans, to hopefully accumulate enough funds to retire at a similar standard of living.

42. The California Teachers Association urges its members to open a 403(b): "To help make sure you have enough income to live on in retirement, it is important to start a personal retirement savings plan, such as a 403(b)." [7]

43. Similar to 401(k) plans, a 403(b) plan allows investors to contribute pre-tax money

---

[5]  *See*  https://edsource.org/2022/teachers-retirement-investments-had-a-negative-return-for-first-time-since-great-recession/676191 (last visited Mar. 20, 2023).

[6]  *See*  https://ctainvest.org/the-academy/your-retirement-journey/overview-of-retirement-benefits (last visited Mar. 20, 2023).

[7] *Id.*

from their paychecks to certain investment products. Pre-tax contributions and investment earnings are not taxed until the money is withdrawn, usually in retirement. This allows money to grow tax free over time, and to be withdrawn at a time when many teachers' tax brackets will presumably be lower than when they were working full-time.

44.    In 1961, the insurance industry introduced the "tax-sheltered annuity" (or "TSA"). Between 1961 and 1974, only TSAs were allowed in 403(b) plans.

45.    In 1974, Congress passed the Employee Retirement Income Security Act ("ERISA"), allowing mutual funds to be used within 403(b) plans.

46.    Currently, there are two main types of investments allowed in 403(b) plans: (1) mutual funds, which are pooled investments owned by many investors and sold by mutual fund companies, and (2) annuities, which are individual insurance products sold by insurance companies.

47.    Despite the fact that mutual funds have been allowed in 403(b) plans for nearly fifty years, insurance providers selling annuities have held onto a large share of the 403(b) market in California. This is true for two primary reasons. First, mutual fund companies were slow to enter the California 403(b) market after the passage of ERISA. Second, insurance companies successfully lobbied the California Legislature to amend state insurance law to prevent school districts from negotiating terms with particular insurance providers and to instead provide that school districts must remit payroll deductions to whichever insurance provider an employee chooses. *See* Cal. Ins. Code § 770.3. This gave insurance companies direct access to educators. It also prohibited school districts from excluding vendors based on the quality of their products or the level of their fees, even though such exclusions are typical for employers who offer 401(k) plans.

48.    In summary, but for the disclosures required by the Code, educators deciding how to invest their 403(b) plan have little in the way of reliable information. There is no guidance from school districts and little guidance from the state about what to invest in. And there are no restraints on which vendors can offer products, which agents are allowed to offer those products (agents need not obtain securities licensure), the tactics those agents can use, or how those agents are compensated. As a result, but for the information required to be disclosed by the Code, most teachers would pick

investments based on the advice of commissioned salespeople, who themselves offer the products that pay them the highest commissions. These commissioned salespeople continue to funnel California public school teachers into the 403(b) products that pay them the highest commissions: annuities.

49.    The Code was intended to break the hold of annuity vendors, by affirmatively providing truthful and relevant investment information to teachers.

### B. Common Types of Annuities.

50.    An annuity is a contract between an individual and insurance company under which the individual makes a lump-sum payment or series of payments and, in return, receives a promise of regular disbursements from the insurance company for a specified future period of time or for the remainder of the individual's life.[8] In an *immediate annuity*, the payments start at the time of the initial investment. In a *deferred annuity*, the payments start at some future date decided by the investor, or the money can be withdrawn and the account closed. Until that time, the payments earn interest. This case concerns deferred annuities.

51.    There are several types of deferred annuities including fixed annuities and variable annuities. This case concerns a third kind of deferred annuity referred to as an indexed annuity.

52.    An indexed annuity (also known as an index annuity, an equity-indexed annuity, a fixed indexed annuity, or an index-linked annuity) pays an interest rate tied to the performance of a specified market index, such as the S&P 500 or the Dow Jones Industrial Average. The insurance company does not invest the investor's money in that underlying market index, but instead invests the money in its general account. The insurance company uses a portion of the earnings it expects to generate to buy derivative instruments that capture a portion of the market's returns, which are then passed along to investors (in part). The insurance company then keeps the rest of the returns generated by the derivatives for itself along with the unused portion of the earnings from its general account.

---

[8] *See* https://www.investopedia.com/terms/a/annuity.asp (last visited Mar. 20, 2023).

**C. The Problems with the 403(b) Marketplace for California Teachers, and the State Legislature's Attempt to Fix It.**

53.     As discussed above, but for the disclosures required by the Code, California teachers were left on their own to make decisions about their retirement savings and have been largely funneled into high-cost indexed annuities. These annuities often involve opaque earnings formulas and high (and confusing) fees, which result in exorbitant profits for insurance companies and low returns for educators.

54.     Making matters worse is the fact that California teachers have historically been confronted by an overwhelming number of 403(b) options, which vary greatly across school districts. Each California school district chooses a financial company as the third-party administrator (or "TPA") of its supplemental retirement programs. The result is an inconsistent and messy web of options available to teachers: "More than 50 firms are approved to be [TPAs] in California, and they can offer more than 120 different financial products to teachers….Companies may offer all of them, or only some. It varies from district to district, and there are more than 1,000 districts in California."[9]

55.     California teachers are thus inundated with 403(b) plan options—which change if a teacher changes school districts—and have had limited means to evaluate differences across annuity products.

56.     The result is that, absent disclosures like those required by the Code, commission-based agents will funnel teachers into indexed annuities from companies like Americo because those products pay among the highest commissions of any 403(b) product on the marketplace, while the teachers (1) cannot learn about all of the fees associated with those products, and (2) are not made aware of better, less expensive alternatives available to them.

57.     Recognizing that public school district employees should not be taken advantage of when planning for retirement, the California Legislature attempted to ensure that these public servants at least have access to critical, accurate, and easy-to-use information about the 403(b) products available to them. With this information, educators have the means to make better informed decisions

---

[9]     *See*   https://www.mercurynews.com/2022/03/12/teachers-school-employees-may-be-paying-thousands-in-extra-fees-on-retirement-accounts/ (emphasis added) (last visited Mar. 20, 2023).

when selecting a supplemental retirement savings plan.

### 1. The Code

58.     Recognizing that "undisclosed fees, penalties, and restrictions" were "erod[ing] [teachers'] savings" as they "struggle to budget for their retirement,"[10] the Legislature passed Cal. Educ. Code § 25100, *et seq.* (the "Code"), which mandated several key protections to ensure public school employees have the information they need and deserve when planning for retirement.

59.     First, the Code requires that prospective vendors that offer 403(b) products to California public school employees register those products with the Teachers' Retirement Board. Cal. Educ. Code § 25101. The Code established a state-sponsored "impartial investment information bank" via a website created in 2004, through which the Teachers' Retirement Board provides information on registered 403(b) products. Cal. Educ. Code § 25104(a). This website— **403bcompare.com**—contains *all* information within the investment information bank.

60.     Second, the Code requires that, on the Website, every 403(b) product vendor provides"[a] disclosure of all expenses paid directly or indirectly by retirement plan participants, including, but not limited to, penalties for early withdrawals, declining or fixed withdrawal charges, surrender or deposit charges, management fees, and annual fees…." for every product offered. Cal. Educ. Code § 25101(a)(3); *see also* Cal. Educ. Code § 25101(a) (requiring that such disclosures be included in "the impartial investment information bank established pursuant to Section 25104").

61.     Importantly, this disclosure obligation is placed entirely on vendors, including Defendant. Under the Code, the Board is "not responsible for, and may not be held liable for the adequacy of the information provided by the participating vendors contained in the information bank." Cal. Educ. Code § 25109. The Code further provides that the Board maintains the information bank "only to provide information supplied by the participating vendors." *Id.* Consistent with the Code, the Board does not police 403bcompare.com. The Board has never removed a vendor based on the content or incompleteness of its submissions on 403bcompare.com and has never removed a vendor or a specific product, other than at the vendor's request.

---

[10] California Bill Analysis, A.B. 2506 Assembly Committee, April 16, 2002.

62. Third—and indicating just how seriously the required disclosures are to be taken—the Code provides that "[a] vendor may not charge a fee associated with a registered 403(b) product that is not disclosed, pursuant to Section 25101." Cal. Educ. Code § 25107. In other words, any fee associated with a 403(b) product that is not disclosed on 403bcompare.com is *per se* illegal.

63. All told, the Code is designed to force 403(b) providers to be fully transparent with teachers about the fees associated with their 403(b) products so that teachers can understand the full range of expenses, whether "paid directly or indirectly," that they will be charged. Cal. Educ. Code § 25101. *See also* California Bill Analysis, A.B. 2506 Senate, Aug. 19, 2002 (explaining that the Code requires "[d]isclosure of expenses paid by retirement plan participants, types of products, product features, and services offered to participants."); *id.* ("Many teachers struggle to budget for their retirement, only to discover that undisclosed fees, penalties, and restrictions erode their savings."). The Code, and its creation of an accessible and publicly available website, is also meant to allow teachers to exchange notes and ideas related to their supplemental retirement options.

64. Moreover, 403(b) vendors' disclosure obligations under the Code are necessarily ongoing. Cal. Educ. Code § 25102. That is, vendors must update the details about their fees on 403bcompare.com so that even after teachers purchase an annuity, they can continue to evaluate potential changes to their investment strategy. This continuing requirement is important, given that contract terms that determine an indexed annuity's earnings (*i.e.*, caps, spreads, and participation rates) change on a monthly basis. When these changes occur, teachers have the option to move their money to a new 403(b) investment, direct their future contributions to a different product, or shift their balance and/or future contributions to a different strategy within their existing annuity.

65. The Code's registration requirement provides an exception for 403(b) products that were sold prior to the Code's effective date of November 30, 2004, stating that employees can continue to contribute to those products, without them being registered. Cal. Educ. Code § 25114. However, any vendor relying on that exception may not offer the product to new enrollees after November 30, 2004. Cal Educ. Code §§ 25101, 25114. Selling the product to a new enrollee after November 30, 2004 triggers the vendor's registration requirement under the Code, and all of the

attendant consequences for failing to register the product and disclose fees associated with that product. Cal. Educ. Code §§ 25101, 25107.

66.     Additionally, the Code's requirement that 403(b) vendors disclose their fees on an ongoing basis also protects educators against risks associated with replacing an annuity altogether. Because many agents receive hefty up-front commissions each time they sell a new product, agents are incentivized to churn teachers for commissions by switching them from one annuity to another. It is essential that teachers have the information necessary to compare their current annuity to any new annuities they might be offered.

67.     Further, the Code's disclosure requirements are critical to supporting fair competition among 403(b) providers that cater to California's public educators. By requiring that all vendors disclose all their fees, the Code creates a level playing field. Indeed, it would be manifestly *un*fair to competition—and, of course, educators—to allow one provider to lure teachers into buying its products by hiding some or all of its fees, while other providers fully disclose theirs. The Code's comprehensive inclusion of all expenses paid by teachers is a critical mechanism for ensuring fair competition.[11]

## 2.   *The Website*

68.     Once a 403(b) vendor is registered to offer 403(b) products, it is given login information for 403bcompare.com that allows it to edit general information about the vendor, add new products, and make changes to the entries associated with existing products. Every product offered by a vendor has its own page that the insurance company can quickly and directly update as information about that product changes.

69.     The information disclosed for a particular product varies based on its type: mutual

---

[11] *Compare* Securities & Exchange Comm'n Division of Investment Management, *Report on Mutual Fund Fees and Expenses* (Dec. 2000) at note 2 ("The Random House College Dictionary defines a fee as 'a charge or payment for services,' Random House College Dictionary 484 (Revised 1st Ed. 1982), and defines an expense as any 'cost or charge.' *Id.* at 465. We use the terms interchangeably in this report.") *with* SEC Office of Investor Education, *Investor Bulletin: How Fees & Expenses Affect Your Investment Portfolio* (June 26, 2019) ("Fees typically come in two types—transaction fees and ongoing fees. Transaction fees are charged each time you enter into a transaction, for example, when you buy a stock or mutual fund. In contrast, ongoing fees *or expenses* are charges you incur regularly.") (emphasis added).

fund, variable annuity, indexed annuity, and fixed annuity.

70.    For each product type, there are certain pre-defined categories of disclosures (*i.e.*, investment information and fees) and then sub-categories frequently associated with the product type. For indexed annuities, these sub-categories include things such as "Indexing and Index Crediting Methodology," "Riders," "Minimum Rate of Return," and "Caps, Spread, and Participation".

71.    The Website allows vendors to leave spaces for pre-defined categories or sub-categories associated with a given product blank, i.e. there are no "required fields" on the Website's form. If the vendor does not include information related to a particular category in its submission to the Board via the Website, the category itself does not appear on the product page.

72.    In addition to the non-mandatory pre-established fields, the Website provides vendors with ample opportunity to satisfy their statutory disclosure requirements. The Product Details tab allows providers to write an overall description of the product of up to 800 characters. The Fees and Charges tab allows vendors to create custom entries where the vendor provides the name of the fee, indicates the percentage or dollar amount, and provides a description of what the fee covers and when it is incurred. Many of the product feature sub-categories include a text box to insert as much or as little information as the vendor chooses.

73.    The Website allows participants to then compare different products to facilitate well-informed choices. The compare feature allows participants to compare specific sub-categories of information across different products. 403bcompare.com is not only for the evaluation of a potential purchase; it is also intended to benefit investors wanting to reevaluate their current product.

74.    Finally, 403bcompare.com allows vendors to designate a product as "Discontinued," meaning that it is no longer offered to new investors. The label is displayed prominently near the top of the product page, and also shown in the list of a vendor's registered 403(b) products. Therefore, vendors can also provide up-to-date information about products that are currently owned by teachers but are no longer being sold.

75.    For a product that has been marked as discontinued, but whose product information needs to be updated, the vendor can either re-activate the product, update the product information,

and then once again mark the product as Discontinued, or the vendor can delete the product information page, and then re-register the same product. Using either method, the Website permits the company to use the same product name and the same product number.

### D. How Defendant's Indexed Annuities Operate.

76.     With an indexed annuity, the investor's money is not actually invested in the specified market index. An indexed annuity is therefore not defined as a security, but instead as an insurance product, wherein the investor cannot lose money, and earns interest based on a complicated formula created by the insurance company, with returns *tied* in some manner to a broad-based securities index. The returns from an indexed annuity are determined by two factors: the "*Crediting Strategy*" (*i.e.*, the index that returns are linked to, how returns are calculated, and the time period over which they are calculated), and *Fees*, including both direct and indirect fees (*i.e.*, contractual terms through which the amount of interest added to the annuity is lower than the actual growth of the underlying index).

### 1. Crediting Strategy

77.     The Crediting Strategy determines the maximum potential return an investor could receive. Most indexed annuities offer several Crediting Strategies to choose from and allow investors to divide their money between multiple Strategies.

78.     The first component of a Crediting Strategy is the *index* to which returns are tied. The most common Strategy ties returns to the S&P 500, an index of large U.S. companies. Many Strategies are tied to the stock market, but that is not a requirement. For example, Defendant offers Crediting Strategies tied to the Barclays Low Volatility 5 Index, which includes only large U.S. stocks that have recently had low levels of price volatility.

79.     The second component of a Crediting Strategy is the *calculation methodology* that determines how the investor's returns will be determined in relation to the index's performance. For example, a "point-to-point" Crediting Strategy measures returns by comparing the index's value on the first and last days of the year, with the return being the amount that index has risen or fallen.

80.     The final component of a Crediting Strategy is the *time period* over which the return is calculated (and the insurance company holds the investor's money) (the "Crediting Period"). One

year is standard (and the default period where the Strategy does not list the Crediting Period), though some Crediting Strategies operate over a two-year period. Interest is credited at the end of the Crediting Period. Unless the investor elects otherwise, at the end of each Crediting Period the investor's initial investment plus the credited interest rolls into a new Crediting Period.

81. For example, Plaintiff Blanchard's money invested in Defendant's 403(b) product was in an annual point-to-point crediting strategy tied to the S&P 500.

82. Crediting Strategies remain fixed even when money rolls from one Crediting Period to the next.

### 2. Fees

83. The returns that investors earn from the Crediting Strategy in indexed annuities, including those offered by Defendant, are reduced by various types of fees.

84. These include earnings generated by the investor's money that the vendor retains, or the contractual terms that produce that result.[12]

85. Such fees are imposed by the insurance company at the beginning of the Crediting Period and are locked in for the duration of that Period. Unlike Crediting Strategies, these fees are subject to change from Crediting Period to Crediting Period, without consent or advanced notice.

86. Defendant sets the fees for each of its products at a level that will (1) generate enough money to cover Defendant's expenses, (2) generate Defendant's desired level of profits, and (3) allow Defendant to purchase derivative securities that will pay all interest potentially due to investors without any risk of losses to Defendant if markets decline, while also allocating a share of the income from those derivatives to Defendant when markets rise. To accomplish these ends, Defendant's indexed annuities contain several key fees.

87. **Caps.** A cap is an upper limit on how much of the Crediting Strategy's returns can be

---

[12] *See* California State Teachers' Retirement System, *403(b) & 457(b) Fundamentals Topics*, at https://www.403bcompare.com/Fundamentals403bAnd457b#ProductFees (identifying types of "Product Fees" and explaining that "[s]ome products claim to have no fees. Be wary of these products. They typically are products that have a low fixed rate of return. The return is low because they are taking the fees out of your returns. Hence, they are 'baked into the product' itself.") (last accessed Mar. 2, 2023).

credited to an investor's account. For example, for the annual period beginning on May 14, 2020, Plaintiff Blanchard had $12,274.13 invested in a S&P 500 point-to-point one-year Crediting Strategy spread out between 33 different Crediting Periods that commenced throughout the next year, with the start date varying based on the week in which the money was originally invested. The index averaged a 28% gain during those 33 different one-year periods. However, Defendant imposed a 10% cap on returns, so Plaintiff Blanchard was credited with $682.50 (a 5.5% gain), rather than the $2,466.67 (a 20.1% gain)[13] she would have earned without the cap that was imposed. The cap therefore cost Blanchard $1,784.17 during this one-year period.

88.     **Participation rates.** Participation rates are the percentage of an index's returns that are credited to an annuity. Where a participation rate is imposed, the investor is only credited with the portion of the Crediting Strategy's return equal to the participation rate. For example, if the Crediting Strategy gains 10% but the participation rate is 30%, the investor's return is 3%. A "participation rate" is functionally a floating cap, expressed as a percentage of market returns. For example, for the same annual period beginning on May 14, 2020, Defendant imposed a participation rate in all 33 of the Crediting Periods that commenced over the next year. These participation rates ranged from 31% to 47%. As described above, despite the S&P 500 averaging a 28% gain during these Crediting Periods, Blanchard earned only $682.50, a 5.5% gain. If Defendant had not imposed a participation rate, Plaintiff Blanchard would have earned an additional $770.39 (an additional 6.28% gain), more than doubling her returns. The participation rate therefore cost Blanchard $770.39 during this one-year period.

89.     **Spread fees.** The spread fee (commonly referred to as an asset fee, margin fee, or administrative fee) is a percentage amount that is subtracted from any gain generated by the Crediting Strategy. For example, Plaintiff Cohen had $20,121.24 invested in a S&P 500 point-to-point two-year Crediting Strategy in Crediting Periods that ended between June 2018 and June 2019. The Strategy would have returned $2,344.08 (a 5.8% annual rate of return), but because Defendant imposed a 4% spread fee, the Strategy only returned $1,539.23, a 3.8% annual rate of return. The

---

[13] As described below, Plaintiff Blanchard was charged other fees beyond this cap, including a participation rate. With all of those fees removed, Blanchard's gain would have been 28%.

spread fee therefore cost Plaintiff Cohen $804.85 during this period.

90.     Caps, participation rates, and spread fees are fees paid by investors. The account statements Defendant sent to Plaintiffs explain as much, stating "The index credited amount depends upon the Participation, Spread, Cap, and change in the index during the crediting period."

91.     As the Securities and Exchange Commission ("SEC") has explained, "Indexed annuities typically use one or more features that restrict the positive return that is applied to your annuity contract value . . . [Participation rates, rate caps, and spread fees] can reduce your return in the same way that a direct fee would even if the annuity is called a 'no fee' annuity."[14]

92.     The National Association of Insurance Commissioners ("NAIC") also refers to the aforementioned items as "fees." "Participation rates, cap rates, and spread rates (sometimes called margin or asset fees) are all terms that describe ways the amount of interest added to your annuity may not reflect the full change in the index." *See* NAIC, Buyer's Guide for Fixed Deferred Annuities, 2013, at 4 (available at https://content.naic.org/sites/default/files/publication-anb-lp-consumer-annuities-fixed.pdf).

93.     Defendant's submissions to the State of California Insurance Commissioner confirm that Defendant sets the caps, participation rates, and spread fees in its indexed annuities to "reflect the company's anticipated experience."[15]

94.     The fees paid by investors add up to Defendant charging some of the highest fees within any 403(b) product offered in California. Between 2019 and 2022, Defendant collected $281 million in profits from investors in indexed annuities on roughly $2.16 billion of account balances held in these products in the United States.

---

[14] Securities and Exchange Commission Office of Investor Education and Advocacy, *Updated Investor Bulletin: Indexed Annuities*, July 31, 2020, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_indexedannuities. The SEC is an important entity under the Code, as Cal. Educ. Code § 25106 provides that the Board should look to the SEC, the Internal Revenue Services ("IRS"), and the National Association of Insurance Commissioners ("NAIC") as sources for the "[d]efinitions or explanations of all fees referred to in the investment information bank."
[15] *See* Americo Financial Life and Annuity Insurance Program 2021 Annual Financial Statement, Non-Guaranteed Elements PDF, at 1, *available at* https://interactive.web.insurance.ca.gov/apex_extprd/f?p=144:6:5165512662175::NO:RP,6:P6_COMPANY_ID,P6_NAIC:3398,61999 under "Financial Statements" tab (last accessed May 5, 2023).

95.     This translates to costs of approximately **3.31% per year** within the indexed annuity 403(b) products that Defendant offers California public school employees. This is nearly double the 1.78% charged by the average 403(b) product in California,[16] and more than three times the median cost of 1.04% within the 6,000 403(b) investment options surveyed by the U.S. Government Accountability Office ("GAO") in its 2022 report.[17] And these averages likely overstate the fees paid by the average 403(b) investor.[18] As advocates for 403(b) reform explain, over a 35-year career of investing $250 per month, a 3% fee (0.31% *lower* than what Defendant collects on average) in a 403(b) investment product will **cut a teacher's retirement savings <u>almost in half</u>** compared to a low-cost 403(b) investment option.[19] *See infra* Chart at ¶ 13.

## DEFENDANT'S ROUTINE FAILURE TO DISCLOSE FEES

**A.   Defendant Routinely Violates the Code by Charging Undisclosed Fees Associated with Its 403(b) Indexed Annuity Products.**

96.     Defendant markets indexed annuities as one of the primary retirement products it sells.[20]

---

[16] *See* https://403bwise.org/education/403b-fact-sheet (last accessed Feb. 27, 2023).

[17] *See* United States Government Accountability Office, *Defined Contribution Plans: 403(b) Investment Options, Fees, and Other Characteristics Varied* (2022) at 34 (showing median investment expense of .90% of over 6,000 investment options surveyed that cost between 0.02% and 3.74%), 46 (showing median administrative fees of 0.1425% on the smallest plans in the survey), *available at* https://www.gao.gov/assets/gao-22-104439.pdf.

[18] The averages stated herein and *supra* in notes 16 and 17 are simple averages that assume the same amount of money is invested in every 403(b) product offered in California, with money spread evenly between every investment option available within that product. This is a flawed assumption, however, because products and investment options with more assets have greater economies of scale, and thus tend to charge lower fees (especially in a well-functioning marketplace with pricing transparency). As the Investment Company Institute—the mutual fund industry's trade organization—has explained, "asset-weighted averages . . . [of] the expenses and fees that shareholders pay through funds . . . are preferable to simple averages, which would overstate the expenses and fees of funds in which investors hold few dollars." Investment Company Institute, 2022 INVESTMENT COMPANY FACT BOOK, at 99, https://www.ici.org/doc-server/pdf%3A2022_factbook.pdf. So while the average expense ratio for equity mutual funds was 1.13 percent in 2021, "[t]he asset-weighted average expense ratio for equity mutual funds (the average shareholders *actually* paid) was far lower, at 0.47 percent." *Id.* at 102 (emphasis added). This suggests that the average 403(b) investor in California is paying far less than the 1.78% average among the products on 403bcompare.

[19] *See* https://403bwise.org/education/bad-403b (last accessed Mar. 2, 2023).

[20] *See* https://www.americo.com/insurance-solutions/retirement/ (last accessed May 4, 2023).

97.     Yet, despite the clear purpose and language of the Code, public school employees routinely incur expenses within Defendant's products that are not disclosed on 403bcompare.com.

98.     Not only does Defendant collect undisclosed and unauthorized fees in violation of the Code, it also engages in unfair competition, including unlawful and unfair business acts or practices, in violation of the UCL.

### 1.  Fees

99.     Currently, on 403bcompare.com, Defendant lists five equity indexed annuities that it offers (including one that has been discontinued). For each product listed on the Website, rather than disclose "all expenses paid directly or indirectly by plan participants," Defendant fails to fully disclose its fees, and instead suggests that California educators "contact [thei]r local representative for current rates" or review their contracts for more information.[21]

100.    Defendant has not updated any of its disclosures about fees on the Website since *April 24, 2017*.

101.    Many of these costs for Defendant's equity indexed annuities are now higher than the costs Defendant disclosed on the Website over six years ago. For example, the product page for the Ultimate One Index 9 on 403bcompare states that the "Current Participation Rate" and "Guaranteed Minimum Participation Rate" are both 100%, but as of May 23, 2022, the "Point-to-Point with Participation Rate" Strategy imposed a 34% participation rate, meaning that credited returns were three times less than what the underlying index earned.[22] The Ultimate One Index 7 product similarly showed 100% current and guaranteed minimum participation rates on 403bcompare.com, but imposed a 31% participation rate as of May 23, 2022.[23] The Ultimate One Index 9 Bonus product page states that the product's annual point-to-point Strategy "Cap is currently 4.50%," but as of May

---

[21] *See* https://www.403bcompare.com/products/125 (last accessed May 27, 2023).

[22] *See* https://www.403bcompare.com/products/124 (last accessed May 27, 2023) *with* https://web.archive.org/web/20220527133159/https://www.americo.com/Content/AnnuityRateCard.pdf (last accessed May 27, 2023).

[23] *Compare* https://www.403bcompare.com/products/123 (last accessed May 27, 2023) *with* https://web.archive.org/web/20220527133159/https://www.americo.com/Content/AnnuityRateCard.pdf (last accessed May 27, 2023).

23, 2022 that Strategy imposed a more stringent cap of 3.35%.[24]

102.     The actual and *current* rates used for caps, spreads, and participation rates are what matter to investors. Recognizing the importance of its specific and up-to-date fees, Defendant routinely discloses new details on its products to its *sales agents*.[25] However, Defendant fails to adequately disclose the updated, accurate, and detailed information that it shares with agents to the public educators who are legally entitled to it. In fact, Defendant explicitly directs sales agents *not* to share the rates with teachers, explaining that such details are "[f]or agent use only. Not for public use."[26] This of course renders Defendant's direction to teachers to "contact their local representative" worthless.

103.     Plaintiffs are two California public educators to whom Defendant failed to disclose complete, accurate, and up-to-date 403(b) plan caps, spreads, and participation rates on 403bcompare.com.

104.     Plaintiff Blanchard purchased and invested in her 403(b) product from Defendant after the passage of the Code (and continues to invest in it to this day); meanwhile, Plaintiff Cohen purchased his 403(b) product from Defendant before the passage of the Code, but continued to invest new money into it for approximately 12 years after the Code's passage. Since the passage of the Code, both Plaintiffs have made 403(b) contributions to those products via payroll deduction through their respective school districts.

105.     Through its incomplete and outdated fee disclosures on the Website for its 403(b) products available to California public school teachers, Defendant has failed to disclose "all expenses paid directly or indirectly by plan participants," i.e., the actual and current caps, participation rates, and spreads on those products. *See* Cal. Educ. Code § 25101(a)(3).

106.     Having failed to disclose these fees on 403bcompare.com, Defendant was not

---

[24] *Compare* https://www.403bcompare.com/products/125 (last accessed May 27, 2023) *with* https://web.archive.org/web/20220527133159/https://www.americo.com/Content/AnnuityRateCard.pdf (last accessed May 27, 2023).
[25] *See* https://www.americo.com/Content/AnnuityRateCard.pdf (showing crediting rates for certain products in effect as of May 26, 2023) (last accessed May 27, 2023).
[26] https://www.americo.com/Content/AnnuityRateCard.pdf.

authorized to charge them. *See* Cal. Educ. Code § 25107.

### 2. *Defendant Provided No Disclosures Whatsoever About the Product That Plaintiffs Invested In*

107.    Plaintiffs invested in Defendant's "403(b) Tax Shelter Annuity" indexed annuity product.[27] There is no mention of Defendant's 403(b) Tax Shelter Annuity product on 403bcompare.com. Defendant has failed to disclose not only this product's fees, but its existence.

108.    This product was subject to heavy undisclosed fees. As of 2019, Defendant charged Plaintiff Cohen participation rates between 54% and 61% (with Defendant pocketing the remaining 39% to 46% of returns) and deducted 4% from each Crediting Strategy's return through a spread fee. As of 2022, Defendant charged Plaintiff Blanchard participation rates between 31% and 36% (with Defendant pocketing the remaining 64% to 69% of returns) and deducted 3% from each Crediting Strategy's return through a spread fee.

109.    If Defendant previously closed this product to new investment, that is no excuse to charge undisclosed fees on teachers who remained invested in it. The Code requires disclosure of fees charged by such products.

110.    Plaintiff Cohen purchased Defendant's 403(b) Tax Shelter Annuity product after the passage of the Code, and made 403(b) contributions to that product via payroll deduction through his school district. Plaintiff Blanchard purchased Defendant's 403(b) Tax Shelter Annuity product in 2002 (before the passage of the Code) and again in 2008 (after the passage of the Code), and made 403(b) contributions to that product via payroll deduction through her school district after the passage of the Code. Yet Defendant either never registered this product, or has removed it from 403bcompare.com, despite the fact that California public school employees have 403(b) accounts invested in that product. Thus, none of the fees incurred by Plaintiffs over the past four years were disclosed on 403bcompare.com.

111.    Having failed to disclose any fees for its 403(b) Tax Shelter Annuity product,

---

[27] Plaintiffs' account statements do not list any product names. However, each Plaintiff was told by Americo customer support that they invested in an Americo product called "403(b) Tax Shelter Annuity".

Defendant was not authorized to charge them. *See* Cal. Educ. Code § 25107.

**THE CODE PROTECTS ALL TEACHERS BY PROTECTING THE MARKET**

112.    The Code protects teachers by requiring transparency in the market. It prevents vendors from charging fees unless they are properly disclosed.

113.    Transparency encourages price competition. It drives down prices—in this case, fees—by forcing vendors to compete for business. Vendors charge the same fees for a given product at a given time to all purchasers. When transparency forces vendors to lower their fees to attract savvy investors, less sophisticated investors benefit as well. The Code benefits not only the teachers who compare fees between vendors, but also other teachers who pay lower fees without necessarily realizing they are enjoying the fruits of competition.

114.    As the Supreme Court has explained, legislators intend retirement plan disclosure requirements to benefit not only the employees who read them, but also their co-workers, who learn the information through "fellow employees [] or informal workspace discussion." *CIGNA Corp. v. Amara*, 563 U.S. 421, 444 (2011). Indeed, the information contained on the Website has become an important tool in the 403(b) marketplace. The GAO relied on Website data in forming its 2022 report to Congress on 403(b) plans,[28] and educators around the country rely on the Website for data on investment products and their associated fees.[29] According to public records requests, as of May 31, 2023, the Website has had 2,321,395 visitors over the past four years, averaging 1,429 per day.

115.    The effect of the Code's transparency requirement thus has widespread effects. So does its enforcement mechanism: the ban on undisclosed fees. All investors are entitled to recover hidden fees that vendors impose. The Code thereby protects all purchasers, whether a vendor complies with the transparency requirement and as a result is pressured to lower its fees or the vendor violates the transparency requirement and must disgorge the unlawful fees it charges.

---

[28] GAO 403(b) Report at 34 (measuring median investment expense using data from the Website).
[29] Dan Otter, 403BWISE.COM, *How to Use 403bcompare.com*, Dec. 1, 2020 ("A [403bwise Facebook Group] post . . . reminded me of another amazing tool: 403bcompare.com. This is a database of 403(b) fee and vendor information for products offered to California public school districts and community colleges. . . . [T]he beauty of the resource is that it can be used by virtually anyone in any state."), available at https://403bwise.org/blog/entry/blog-403bcompare-praise.

1

**CLASS ACTION ALLEGATIONS**

2

116.    Plaintiffs bring their claims on behalf of themselves individually, and the following

3

Class pursuant to Fed. R. Civ. P. 23:

4

> All public employees of all California local school districts, community college

5

> districts, county offices of education, and state employees of a state employer under
> the uniform state payroll system, excluding the California State University System,

6

> eligible to participate in an annuity contract and custodial account as described in
> Section 403(b) of the Internal Revenue Code of 1986 who, in the four years

7

> predating the filing of the initial Complaint and continuing through the date the
> class list is prepared, (1) were invested in an indexed annuity 403(b) product issued

8

> by Defendant and (2) paid fees that were not disclosed on 403bcompare.com.

9

117.    <u>Numerosity</u>: The Class is so numerous that joinder of all class members is

10

impracticable. Given the volume of Defendant's business, there are hundreds or thousands of class

11

members.

12

118.    <u>Commonality</u>: This case presents common questions of law and fact, including but not

13

limited to:

14

a)    Whether Defendant violated the Code;

15

b)    Whether Defendant's conduct was unlawful and unfair under the UCL;

16

c)    The proper scope of injunctive relief; and

17

d)    The proper measure of restitution.

18

119.    <u>Typicality</u>: Plaintiffs' claims are typical of the members of the Class. The UCL

19

violations suffered by Plaintiffs are typical of those suffered by other class members, and Defendant

20

treated Plaintiffs consistently with other class members in accordance with its standard policies and

21

practices.

22

120.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Class

23

because they and their experienced counsel are free of any conflicts of interest and are prepared to

24

vigorously litigate this action on behalf of the Class.

25

121.    <u>Predominance</u>: Class certification is appropriate under Fed. R. Civ. P. 23(b)(3)

26

because questions of law and fact common to the Class predominate over any questions affecting

27

only individual members of the Class, and because a class action is superior to other available

28

methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the UCL. Members of the Class do not have an interest in pursuing separate actions against Defendant, as the amount of each class member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

122.    In view of the complexities of the issues and the expenses of litigation, the separate claims of individual class members are insufficient in amount to support separate actions.

123.    Yet, the amount which may be recovered by individual class members will be large enough in relation to the expense and effort of administering the action to justify a class action. The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

**CLAIM FOR RELIEF**
**CAL. BUS. & PROF. CODE § 17200**
**On behalf of Plaintiffs Individually and the Class**

124.    Plaintiffs reiterate each of the allegations in the preceding paragraphs as if set forth at length herein.

125.    Plaintiffs and class members are "persons" within the meaning of Section 17201 of the UCL.

126.    Plaintiffs lack an adequate remedy at law to obtain relief for the violations of law and harms alleged above.

127.    The UCL defines "unfair competition" to include any unlawful, unfair, or fraudulent business act or practice, and prohibits such acts or practices. Cal. Bus. & Prof. Code § 17200.

128.    Because the UCL is written in the disjunctive, a business act or practice need only meet one of the three criteria—unlawful, unfair, or fraudulent—to be considered unfair competition.

129.    Defendant has engaged and continues to engage in unfair competition within the meaning of the UCL because Defendant's conduct alleged herein is both unlawful and unfair.

130.    Defendant's conduct, as described herein, violates the UCL's "unlawful" prong.

131.    Defendant is a "vendor" within the meaning of Cal. Educ. Code § 25100(c)(2).

132.    As such, Defendant is required to make a "disclosure of all expenses paid directly or indirectly by retirement plan participants, including, but not limited to, penalties for early withdrawals, declining or fixed withdrawal charges, surrender or deposit charges, management fees, and annual fees," which "shall be included in the impartial investment information bank established pursuant to Section 25104" (*i.e.*, 403compare.com), and is prohibited from charging any fees associated with its 403(b) products that are not so disclosed. Cal. Educ. Code § 25107; Cal. Educ. Code § 25101.

133.    However, in violation of the Code, Defendant routinely charges fees on its 403(b) products which are not disclosed on 403bcompare.com.

134.    Defendant's violations of the Code serve as predicate unlawful actions under the UCL.

135.    Separately, Defendant's conduct, as described herein, also violates the UCL's "unfair" prong as Defendant's conduct is unfair to consumers, using any of the three standards used by California courts in UCL consumer actions.

136.    First, Defendant's practice of charging undisclosed and hefty fees on its 403(b) products is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and has caused harm to Plaintiffs and class members. The harm caused by these business practices—*i.e.*, skimming tens of millions of dollars from the retirement savings of unsuspecting public servants—vastly outweighs any legitimate utility they possible could have.

137.    Second, the undisclosed fees within Defendant's 403(b) products (1) have caused, and continue to cause, substantial injury to Plaintiffs and class members; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) the injury could not reasonably have been avoided by Plaintiffs and class members.

138.    Third, Defendant's conduct is also unfair as it significantly threatens or harms

competition. By failing to disclose expenses, Defendant has made it appear as though its 403(b) products cost less than those offered by Defendant's competitors, who comply with the Code and disclose on 403bcompare.com the full range of fees investors will pay within their 403(b) products. By hiding many of its fees, Defendant has managed to lure California public school teachers to invest in its products (which are, in many cases, objectively worse than other products available) and to emerge as a leading annuities provider to the state's educators. Defendant then traps these unknowing investors in its products by assessing hefty surrender charges. The Legislature's declared policy in the Code is that *all* 403(b) vendors must disclose *all* their fees. Given the Legislature's clear directive—which protects both educators and other vendors—Defendant's conduct violates the policy and spirit of the Code and is therefore unfair. Defendant's conduct provides Defendant an unfair advantage over its competitors, which comply with applicable disclosure requirements under the Code.

139.    As a result of Defendant's unlawful and unfair practices, Plaintiffs and class members have suffered injury in fact because they paid undisclosed and unauthorized fees on the 403(b) products that they purchased from Defendant.

140.    Because Plaintiff Blanchard still has a 403(b) product with Defendant, and because of the ubiquity of Defendant's unlawful and unfair business practices, there is a real and immediate threat that Plaintiff Blanchard will suffer the same injury—being charged unauthorized fees—in the future.

141.    Plaintiffs and the Class are entitled to, and do seek, equitable restitution and the recovery of attorneys' fees and costs.

142.    Plaintiffs and the Class are also entitled to, and do seek, an injunction prohibiting Defendant from continuing its unlawful and unfair conduct and for an order requiring Defendant to make full disclosures on 403bcompare.com of the fees associated with its registered 403(b) products.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, seek the following relief:

a.    Determining that this action may proceed as a class action under Fed R. Civ. P.

1   23;

2      b.  Designating Plaintiffs as the class representatives for the Class;

3      c.  Designating Plaintiffs' Counsel as counsel for the Class;

4      d.  Issuing proper notice to the Class at Defendant's expense;

5      e.  Declaring that Defendant committed multiple violations of the UCL;

6      f.  Granting appropriate restitution;

7      g.  Granting appropriate injunctive relief;

8      h.  For an order awarding attorneys' fees, expenses, and recoverable costs reasonably

9         incurred in connection with the commencement and prosecution of this action

10        including but not limited to attorneys' fees and expenses under the substantial

11        benefit and/or common fund doctrine or other similar principle or doctrine, or in

12        accordance with Cal. Code of Civ. Proc. §§ 1021.5; and

13     i.  Granting other and further relief, in law or equity, as this Court may deem

14        appropriate and just.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues triable by a jury.

ENGSTROM LEE LLC

Dated: October 20, 2023

/s/Carl F. Engstrom
Carl F. Engstrom, *pro hac vice*
*Counsel for All Plaintiffs*